1  **IN THE UNITED STATES DISTRICT COURT**
   **FOR THE DISTRICT OF PUERTO RICO**

2

3  PUERTO RICO CAMPERS' ASSOCIATION

4    Plaintiff

5    v.                                    **CIVIL NO. 97-1493 (JAG/GAG)**

6  PUERTO RICO AQUEDUCT AND SEWER
7  AUTHORITY

8    Defendant

9  _____

10                    **OPINION AND ORDER**

11      Plaintiff Puerto Rico Camper's Association Inc. ("PRCA") filed the present lawsuit on April

12  7, 1997, against the Puerto Rico Aqueduct and Sewer Authority ("PRASA"), for alleged violations

13  of Sections 301(a) and 505(a)(1) of the Federal Water Pollution Control Act, 33 U.S.C. §1311(a)

14  and 1365(a)(1).   The plaintiff seeks a declaratory judgment, injunctive relief, civil penalties, and

15  the award of costs and attorney's fees. (See Docket No. 61).

16      The PRCA filed  the original complaint on April 7, 1997 (see Docket No. 1) and then

17  amended the same on two occasions. The first amended complaint was filed on April 1, 1998 (see

18  Docket No. 22) and the second on November 28, 2001 (see Docket No. 64). On May 8, 2002,

19  PRASA filed a motion for summary judgment which included a memorandum of law and a 311.12

20  statement of undisputed material facts. (See Docket No. 77).  On May 21, 2002, PRASA filed an

21  amended 311.12. statement. (See Docket No. 81).  On June 14, 2002, the PRCA filed an opposition

22  to the motion for summary judgment along with a 311.12 counterstatement. (See Docket No. 83).

23  On July 1, 2002, PRASA filed a motion requesting leave to file a reply to PRASA's opposition to

24  summary judgment. (See Docket No. 86). The Court granted the same on July 3, 2002. (See Docket

25  Nos. 87 and 88).  PRASA filed its reply on July 22, 2002.  (See Docket No. 89).

26      On October 4, 2001, U.S. District Judge Jay A. García Gregory referred the present matter

27  to this Magistrate-Judge.  On November 28, 2001, PRASA consented to proceed before the

28  undersigned in accordance with the provisions of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  On







1    CIVIL NO. 97-1493 (JAG/GAG)    2

2    December 7, 2001, PRASA followed suit, also consenting to proceed before the undersigned. (See

3    Docket Nos. 63, 65 and 68).

4    **Summary Judgment Standard**

5    Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on

6    summary judgment motions: "[t]he judgment sought shall be rendered forthwith if the pleadings,

7    depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

8    show that there is no genuine issue of material fact and that the moving party is entitled to a

9    judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine  issue exists if there is sufficient

10    evidence supporting the claimed factual dispute to require a choice between the parties' differing

11    versions of the truth at trial. Morris v. Government Dev. Bank of Puerto Rico, 27 F. 3d 746, 748 (1st

12    Cir. 1994); LeBlanc v. Great Am. Ins. Co., 6 F. 3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S.

13    1018 (1994).  A fact is material if it might affect the outcome of the suit under the governing law.

14    Morrisey v. Boston Five Cents Sav. Bank, 54 F. 3d 27, 31 (1st Cir. 1995); Maldonado Denis v.

15    Castillo-Rodríguez, 23 F. 3d 576, 581 (1st Cir. 1997).  Nonetheless, the court is free to "ignore

16    'conclusory allegations, improbable inferences and unsupported speculation.'" Suárez v. Pueblo

17    International, Inc., 229 F. 3d 49, 53 (1st Cir. 2000)(citing Medina-Muñoz v. R.J. Reynolds Tobacco

18    Co., 896 F. 2d 5, 8 (1st Cir. 1990)).

19    **Factual Background**

20    PRASA operates two waste water treatment plants ("WWTP") on the northeastern coast of

21    Puerto Rico which are the basis for the present litigation.  These are the Palmer WWTP ("Palmer

22    plant"), located in the municipality of Rio Grande, and the Brisas del Mar WWTP ("Brisas del Mar

23    plant"), located in the municipality of Luquillo.

24    On January 18, 1994, the United States Environmental Protection Agency ("EPA") issued

25    National Pollutant Discharge Elimination System (NPDES) permit number PR0024538 to PRASA

26    for the operation of the Palmer WWTP.  Pursuant to the NPDES permit, PRASA is authorized to

27    discharge up to 0.25 million gallons per day ("MGD") of treated effluent[1] through its outfall 001 and

28    ————————————

[1] Effluent is defined in Black's Law Dictionary (7th ed.) as "liquid waste that is discharged into a river, lake, or other body of water".

1   CIVIL NO. 97-1493 (JAG/GAG)                3

2   into the Mameyes River.

3       On September 28, 1995, the EPA issued NPDES permit number PR0021695 to PRASA for

4   the operation of the Brisas del Mar WWTP. Pursuant to the NPDES permit, PRASA is authorized

5   to discharge up to 1.3 MGD of treated effluent through its outfall 001 and into the Sabana River.

6       On May 30, 1995, PRASA submitted to the EPA a request to modify the Plamer plant's

7   NPDES permit, seeking authorization to increase it's effluent flow from 0.25 MGD to 1.25 MGD.

8   PRASA's request was directly prompted by its construction and installation of two secondary

9   treatment package plants, each with the capacity of processing 0.5 MGD of effluent. The Palmer

10  plant had the capacity to discharge 1.25 MGD of effluent prior to any approval of said request. On

11  November 22, 1995, PRASA received approval to increase discharges to 1.25 MGD, in the form of

12  a modified water quality certificate, issued by the Puerto Rico Environmental Quality Board

13  ("EQB"). On March 20, 1996, based on the water quality certificate issued by the EQB, the EPA

14  issued a draft NPDES permit modification for the increase in flow at the Palmer plant. However,

15  on August 1, 1997, the EPA formally denied the requested modification. Said decision was affirmed

16  by the agency's Environmental Appeals Board on October 22, 1997.



17      Between July and August of 1996, PRASA constructed a connecting pipe ("connecting

18  pipe") between the Palmer plant and the Brisas del Mar plant. The purpose of this connecting pipe

19  was to divert effluent from the Palmer plant to the Brisas del Mar plant. On August 20, 1996, the

20  Palmer plant terminated its direct discharges into the Mameyes River and began conveying effluent

21  from the Palmer plant to the Brisas del Mar plant. On September 30, 1996, PRASA formally

22  notified the EQB and the EPA of said connection between the two WWTPs.

23      Although the Palmer plant terminated its discharges into the Mameyes River on August 20,

24  1996, the plant did discharge effluent into said river during the months of March and April of 1997,

25  allegedly in order to monitor the effectiveness of the Palmer plant's expansion. PRASA alleged that

26  these discharges did not exceed the 0.25 MGD flow limitation set out in the Palmer plant's NPDES

27  permit. Also, in November of 1997 and in June of 1998 two overflows of effluent occurred at the

28  Palmer plant. Apart from those limited discharges and/or isolated overflows, the Palmer plant has

1 CIVIL NO. 97-1493 (JAG/GAG)   4

2 relayed all of its treated effluent to the Brisas del Mar Plant. The combined Palmer-Brisas del Mar

3 treated effluents were discharged through the outfall 001 of the Brisas del Mar plant in accordance

4 with the Brisas del Mar NPDES permit. At the end of 1998, PRASA sealed off the outfall from the

5 Palmer plant.

6        **<u>Statutory Background</u>**

7    In 1972, Congress enacted the Clean Water Act (CWA), as amended, 33 U.S.C. § 1251 *et*

8 *seq.*, "to restore and maintain the chemical, physical, and biological integrity of the nation's waters."

9 Section 402 of the CWA, 33 U.S.C. § 1342, provides for the issuance of NPDES permits, by the

10 Administrator of the EPA or by authorized States. Pursuant to the CWA, the Environmental

11 Protection Agency (EPA) promulgates regulations by means of such NPDES permits limiting the

12 amount of effluent that can be discharged into navigable waters from a point source. Both the

13 Palmer and Brisas del Mar WWTPs are subject to the mandates of the Clean Water Act. <u>See</u> 33

14 U.S.C. 1251 *et seq.*

15    "A linchpin of the CWA's regulatory scheme is the NPDES permit program, which
     allows certain discharges of pollutants only if in compliance with government-issued
16    permits, and imposes related monitoring and reporting requirements. <u>See</u> 33 U.S.C.
     1342. The Clean Water Act makes illegal any discharge of pollutants that are not
17    specifically allowed by an NPDES permit. 33 U.S.C. § 1311(a)."

18 <u>Ecological Rights Foundation v. Pacific Lumber Co.</u>, 230 F. 3d 1141, 1145 (9th Cir. 2000).

19    Under Section 505 of the CWA, "a suit to enforce any limitation in an NPDES permit may

20 be brought by any 'citizen,' defined as 'a person or persons having an interest which is or may be

21 adversely affected.' 33 U.S.C. § 1365(a), (g)." <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.</u>,

22 528 U.S. 167, 174 (2000). Section 1365(a)(1) of the CWA provides as follows,

23    "Except as provided in subsection (b) of this section and section 1319(g)(6) of this
     title, any citizen may commence a civil action on his own behalf-(1) against any
24    person (including (i) the United States, and (ii) any other governmental
     instrumentality or agency to the extent permitted by the Eleventh Amendment to the
25    Constitution) who is <u>alleged to be in violation of (A) an effluent standard or
     limitation under this chapter</u> or (B) an order issued by the Administrator or a State
26    with respect to such a standard or limitation." (Emphasis added).

27 "A citizen suit may be brought only for violations of a permit limitation 'which is in effect' under

28 the Act". 33 U.S.C. § 1365(f)." <u>Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.</u>

1  CIVIL NO. 97-1493 (JAG/GAG)          5

2  484 U.S. 49, 60 (1987).   Prior to a citizen filing suit under the CWA, the would-be plaintiff must

3  give notice, at least sixty (60) days prior to filing suit, of the alleged violation and its intent to sue,

4  to the EPA, the State in which the alleged violation occurred, and to the alleged violator.  See 33

5  U.S.C. § 1365 (b)(1)(a).  "If the Administrator [EPA] or the State commences enforcement action

6  within the 60-day period, the citizen suit is barred, presumably because governmental action has

7  rendered it unnecessary." Id. More so, "citizens lack statutory standing under Section 505(a)[2] to sue

8  for violations that have ceased by the time the complaint is filed."  Friends of the Earth, Inc. v.

9  Laidlaw Envtl. Servs., supra at 175.  In the case at bar, PRASA does not dispute that the plaintiff

10  has satisfied the adequate notice requirement.

11                              **Legal Analysis**

12        PRASA's motion for summary judgment presents the following four arguments.  First, the

13  plaintiff fails to state a claim upon which relief may be granted because the Palmer plant is no longer

14  discharging effluent.  Second, the plaintiff lacks Article III standing.  Third, the plaintiff lacks

15  prudential standing because it presents a claim that falls outside the zone of interest protected by the

16  Clean Water Act.  Fourth, the plaintiff's claims are moot.  The Court shall proceed to address each

17  argument.

18  I. **Article III Standing**

19        The Court has the obligation of ascertaining whether PRCA had Article III standing at the

20  outset of this litigation.  In order to meet the requirement of Article III standing a plaintiff must

21  show, not merely that it has brought a justiciable issue before the Court; it must further show that

22  it has sufficiently personal stake in the issue.  Becker v. FEC, 230 F.3d 381, 385 (1st Cir. 2000).

23  This means that PRCA must meet the following three elements in order to have standing:

24        "(1) it suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual
        or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the
25        challenged action of the defendant; and (3) it is likely, as opposed to merely
        speculative, that the injury will be redressed by a favorable decision."

26

27  _____

28        [2] 33 U.S.C. § 1365(a).



1   CIVIL NO. 97-1493 (JAG/GAG)            6

2   Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. at 180.

3          "Standing consists of both a constitutional aspect and a prudential aspect. The constitutional

4   dimension derives from the requirement that federal courts can act only upon a justiciable case or

5   controversy. U.S. Const. Art. III." Dubois v. United States Dept. of Agriculture, 102 F. 3d 1273,

6   1280-1281 (1st Cir. 1996). If a plaintiff lacks the aforementioned constitutional standing to bring

7   the matter before the court, the Court lacks subject matter jurisdiction to decide the merits of the

8   case.

9          PRASA contends that PRCA lacks Article III standing for two reasons. First, PRCA has not

10  met the burden of proving the crucial elements of Article III standing. Second, PRCA has failed to

11  demonstrate a right to associational standing. The Court will consider Article III standing as to the

12  Palmer and Brisas del Mar Plants separately.

13         A. The Palmer Plant

14         The Palmer Plant, pursuant to its NPDES permit,[3] is authorized to discharge up to 0.25

15  million gallons per day ("MGD") of treated effluent through its outfall into the Mameyes River.

16         PRCA has submitted to the Court a number of sworn statements from its members who

17  declare that PRASA's discharges into the Mameyes River, have caused them injury and continue

18  to do so. These members state that such discharges raise reasonable concerns among them regarding

19  possible negative effects to their health and the river's ecology, directly affecting their recreational

20  and aesthetic interests. The sworn statements submitted by PRCA are those of Carlos Vega-Agosto,

21  Mercedes Narváez and Gloria Fontanez-Marcano. Carlos Vega-Agosto states that:

22         "Although I have not abstained from swimming in the Mameyes River's Estuary or
           the Luquillo Recreational Area, I now do so with greater distrust about the potential
23         health effects that might result from coming into contact with waters that are
           contaminated by sewage effluent. Whereas before I used these waters with total
24         trust, I now have serious doubts about their polluted state, mainly because I am
           concerned for my children's health." (See Docket No.77, Exhibit 18(a)).
25
    In his sworn statement, Vega-Agosto also mentions his appreciation of the aesthetic beauty of the
26

27  _____

28         [3] NPDES permit number PR0024538.

1  CIVIL NO. 97-1493 (JAG/GAG)          7

2  Mameyes River.    Mercedes Narváez similarly states, "I have abstained from swimming in the

3  Mameyes estuary and will not allow my children to so." (See Docket No. 77, Exhibit 18(b)). Gloria

4  Fontanez-Marcano states, "If the [Palmer Plant] stopped violating its permit I would once again use

5  · the river for contact recreation." (See Docket 77, Exhibit 18(c)).

6          "The relevant showing for purposes of Article III standing...is not injury to the environment

7  but injury to the plaintiff." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. at 182. The

8  Supreme Court has "held that environmental plaintiffs adequately allege injury in fact when they

9  aver that they use the affected area and are persons 'for whom the aesthetic and recreational values

10  of the area will be lessened' by the challenged activity." Friends of the Earth, supra at 183.[4]

11  Clearly, these three particular member of the association have alleged that their aesthetic and

12  recreational interests have been adversely affected due to PRASA's alleged violations. Thus, they



13  have suffered an "injury in fact" as required to maintain Article III standing.

14          PRCA has also properly alleged, by way of its members' sworn statements and other

15  exhibits, that its members' "injuries in fact" are the product of the Palmer WWTP's violations of its

16  NPDES permit. As of the date the complaint was filed and during the present litigation, the Palmer

17  Plant has violated its NPDES permit on a number of occasions.[5]

18          The PRCA members condemn the alleged violations and state that if these cease they will

19  resume their use of the Mameyes River. Plaintiff has succeeded in demonstrating that its members'

20  _____

21          [4]  PRASA states that Friends of the Earth is inapplicable because "the incontrovertible
22  evidence  in the present case demonstrates that the Palmer Plant was not discharging at the time of
    PRCA members' injuries and does not discharge into the Mameyes River today." (See Docket No.
23  77, pg. 25 n.29). The Court notes, however, that the plaintiff's injuries commenced prior to the
    filing of the complaint, were present at the time the complaint was filed, and, a genuine issue of fact
24  remains as to whether these injuries have continued. Thus, the Court notes that Friends of the Earth
25  is applicable to the present case.

26          [5]  First, the Palmer plant discharged, on a number of occasions,  greater amounts of effluent
    than  it's NPDES permit allows. Second, the plant has discharged contaminates in excess of the
27  limits allowed by its permit. Third, it is apparent from the amounts of waste water report as
    discharged daily during June of 1998, that PRASA was operating the plant's expansion which is not
28  authorized by it's NPDES permit. (See Docket Nos. 90, Exhibit 24 and 83, Exhibit 1).

1   CIVIL NO. 97-1493 (JAG/GAG)              8

2   injuries are "fairly traceable to the challenged action," and has thus met the second element of the

3   standing formula.

4          The plaintiff has also properly demonstrated to the Court that the injury suffered may be

5   "redressed by a favorable decision," thus meeting the third requirement for PRCA to have standing.

6   Among the remedies the plaintiff seeks are those of injunctive relief and civil penalties.  If a private

7   citizen who commences a civil action against an entity alleged to be in violation of an NPDES

8   permit in fact prevails in such an action, "the court may order injunctive relief and/or impose civil

9   penalties payable to the United States Treasury. § 1365(a)."  <u>Gwaltney of Smithfield, Ltd. v.</u>

10  <u>Chesapeake Bay Foundation, Inc.</u> 484 U.S. at 53.  Although the PRCA must demonstrate standing

11  separately for each form of relief sought, PRASA,  for purposes of summary judgment, has not

12  challenged PRACA's standing with regards to these particular remedies.  <u>See</u> <u>Friends of the Earth,</u>

13  <u>Inc. v. Laidlaw Envtl. Servs.</u>, 528 U.S. at 185.

14         As an additional argument, PRASA alleges that the "plaintiff cannot claim an interest that

15  is protected under the Clean Water Act because the statute is intended to protect against discharges

16  to waters of the United States.  Here no such discharge exists because the Palmer outfall no longer

17  exists." (<u>See</u> Docket No. 77, pg. 19).  PRASA's contention, however, is incorrect.  Citizens lack

18  standing under Section 505(a), 33 U.S.C. § 1365(a), to sue for violations that have ceased by the

19  time the suit is filed. <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.</u>, 528 U.S. at 176.  However,

20  on April 7, 1997, when PRCA  filed the present suit, the Palmer outfall was still discharging, and

21  has discharged on a number of other occasions since.  PRASA  admits that the plant discharged into

22  the Mameyes River during March and April of 1997, and again in November of 1997 and June of

23  1998. (<u>See</u> Docket No. 77, pg. 3).  For purposes of the Act, a plaintiff only has to demonstrate that

24  the violations were ongoing at the time the complaint was filed.  The plaintiff has succeeded in

25  demonstrating that a genuine issue of material fact exists as to whether PRASA was incurring in

26  violations on the date the complaint was filed and has unquestionably demonstrated that PRASA

27  incurred in violations after the date on which the complaint was filed.  Also, at the present time a

28  genuine issue of material fact exists as to whether the Palmer plant discharged through its outfall,



1   CIVIL NO. 97-1493 (JAG/GAG)          9

2   or by other means, on other occasions besides the aforementioned.

3          PRASA's second argument regarding standing is that PRCA lacks associational standing to

4   enforce the Palmer plant's NPDES permit. The general rule is that "a plaintiff must assert his[/her]

5   own legal rights and interests, and cannot rest his[/her] claims to relief on the legal rights or interests

6   of third parties." Dubois, supra, 102 F. 3d at 1281 (citing Warth v. Seldin, 422 U.S. 490, 501

7   (1975)). However, membership associations represent an exception to the general rule Id.

8          "An association has standing to bring suit on behalf of its members when its
       members would otherwise have standing to sue in their own right, the interests at
9      stake are germane to the organization's purpose, and neither the claim asserted nor
       the relief requested requires the participation of individual members in the lawsuit."
10

11  Friends of the Earth, supra at 181. PRCA meets the three requirements of associational standing.

12  The three sworn statements previously considered by the Court are sufficient to satisfy the

13  requirements of Article III standing as to each of the three individual members. Second, the

14  purposes for which the PRCA was founded are closely linked to the claim asserted.[6] Third, neither

15  the claim, nor the relief, require the participation of the individual members.

16         In sum, the Court concludes that PRCA has both constitutional and associational standing

17  to enforce the Palmer plant's NPDES permit, in accordance with the requirements expressed in

18  Friends of the Earth, supra.

19         B. Brisas del Mar Plant

20         The Brisas del Mar Plant, pursuant to the NPDES permit,[7] is authorized to discharge up

21  to 1.3 MGD of treated effluent through its outfall into the Sabana River.

22         In order to ascertain whether PRCA had Article III standing to file the present Section 505(a)

23  suit for alleged violations to the Brisas del Mar's NPDES permit, the Court has also taken into

24  _____

25         [6] "Plaintiff Puerto Rico Campers' Association, Inc. (The Camper's Association) is a not-for-
    profit membership corporation organized under the laws of the Commonwealth of Puerto Rico that
26  has four Chapters throughout the island of Puerto Rico and an estimated two hundred members.
    The Camper's Association is an environmental group dedicated to the promotion of backpacking as a
27  means to learn about and enjoy the beauty of nature." (See Docket No. 64, pg. 4,¶ 11).

28         [7] NPDES permit number PR0021695.

1   CIVIL NO. 97-1493 (JAG/GAG)              10

2   consideration the aforementioned sworn statements of Carlos Vega-Agosto, Mercedes Narváez and

3   Gloria Fontanez-Mercano.[8] The first requirement that must be met in order to establish Article III

4   standing under Friends of the Earth, supra, is that PRCA demonstrate that its members have suffered

5   an "injury in fact." As previously stated, "plaintiffs adequately allege injury in fact when they aver

6   that they use the affected area and are persons 'for whom the aesthetic and recreational values or the

7   area will be lessened' by the challenged activity." Friends of the Earth, supra at 183.

8        The sworn statements submitted by PRCA reflect its members' concern that the discharges

9   from the Brisas del Mar Plant, which is alleged to be violating its NPDES permit, affect their

10   aesthetic and recreational interests. These statements, however, reflect the plaintiff members'

11   concerns regarding possible effects of contamination at the La Pared Beach[9] and the Luquillo

12   Recreational Area,[10] and not the Sabana River, body of water into which the plant discharges. In the

13   sworn statements provided, not one single allegation of aesthetic or recreational interests in the

14   Sabana River is present. In fact PRCA has not provided the Court with any evidence which would

15   permit the Court to infer that its members have visited, much less recreated in the Sabana River,

16   along its shores or its estuary.

17        PRCA cites both Friends of the Earth, supra and Ecological Rights Foundation v. Pacific

18   Lumber Co., 230 F. 3d 1141 (9th Cir. 2000), in support of its argument of "injury in fact." The

19   Court notes, however, that the plaintiff alleges injuries that are fundamentally different to those

20   leading to Article III standing in both the Friends of the Earth and Pacific Lumber cases. These

21   differ in that PRCA's alleged injuries are linked to two (2) beaches along the northeastern coastline

22

23   _____

24   [8] The three sworn statements referred to by the Court represent the only declarations provided by PRCA in its memorandum in opposition to PRASA's motion for summary judgment.

25

26   [9] According to the plaintiff, La Pared Beach is located near where the Sabana River discharges. (See Docket No.83, pg. 18).

27

28   [10] The Luquillo Recreational area is located to the west, possibly two and a half miles to three miles, from where the Sabana River discharges into the Atlantic Ocean.

1    CIVIL NO. 97-1493 (JAG/GAG)          11

2    of Puerto Rico which are part of the Atlantic Ocean, and not of the Sabana River.  In <u>Friends of the</u>

3    <u>Earth</u>, the Court determined that the plaintiffs had standing due to "injuries in fact" directly related

4    to the North Tyger River.  All of the affidavits cited by the <u>Friends of the Earth</u> Court entailed

5    injuries to plaintiffs due to Laidlaw's discharges into *that specific body of water*.  In the <u>Pacific</u>

6    <u>Lumber</u> case, the Court determined that the plaintiffs had standing due to "Hinderyckx's and

7    Evenson's use, respectively, of Yager Creek," the waterway receiving the contaminants. In that case

8    standing was not linked to the waterways downstream from Yager Creek.

9         In the present case, the PRCA states that its members engaged and/or presently engage  in

10   recreational activities in or near the Mameyes and Sabana rivers or their respective estuaries. (<u>See</u>

11   Docket No. 83, pgs. 17-18). However, the Court was not provided any statements capable of linking

12   PRCA's members to the Sabana River as portrayed in its memorandum. Carlos Vega-Agosto states

13   that he uses "La Pared beach, located in Luquillo near discharge point of the Sabana River" for non-

14   contact recreational activities. ( <u>See</u> Docket No. 77, Exhibit 18(a)).  The prior statement, that La

15   Pared beach is near the Sabana River's discharge point,  in and of itself is insufficient for the Court

16   to conclude that Vega-Agosto has engaged in recreational activities involving the Sabana River or

17   its estuary.

18        Carlos Vega-Agosto, Mercedes Narváez and Gloria Fontanez-Mercano also state, that they

19   are concerned that the Luquillo recreational area may be affected by contaminants discharged from

20   the Palmer and Brisas del Mar plants.  The Court, however, notes that the referred to recreational

21   area is possibly two (2) miles to the west of the mouth of the Sabana River.  The plaintiff could

22   have, yet did not, provide the Court with maps demonstrating the precise locations of the WWTPs,

23   the location of such plants' point sources, the distance between the points of discharge from the

24   mouth of the rivers, the distances between the mouths of the rivers and areas allegedly frequented,

25   as well as, information regarding the predominant ocean currents in the alleged affected zones,

26   which would permit the Court to find "injury in fact".  As the plaintiff has not succeeded in

27   demonstrating "injury in fact," it has failed to meet the "mild burden"[11] of establishing standing in

28   ────────────────────



[11]  <u>See</u> John D. Echevarria, *Citizen Suits and the Future of Standing in the 21st Century:*
*From Lujan to Laidlaw and Beyond: Critiquing Laidlaw: Congressional Power to Confer Standing*

1  CIVIL NO. 97-1493 (JAG/GAG)                12

2  compliance with Friends of the Earth, supra.

3        Because the Court concludes that PRCA lacks Article III standing to enforce the Brisas del

4  Mar Plants NPDES permit, it shall not address PRASA's alternate theory of lack of associational

5  standing.

6  **II. Prudential Standing**

7        PRASA alludes to the doctrine of prudential standing in its memorandum, alleging that

8  PRCA lacks the same. (See Docket No.77, pg 28). This doctrine has been described as follows:

9        "The general prohibition on a litigant's raising another person's legal rights, the rule
         barring the adjudication of generalized grievances more appropriately addressed in
10       the representative branches, and the requirement that a plaintiff's complaint fall
         within the zone interest protected by the law invoked."

11
   Devlin v. Scardellett, ___U.S.___,122 S. Ct. 2005, 2009 (2002)(citing Allen v. Wright, 468 U.S.
12
   737, 751 (1984)). PRASA claims that PRCA has failed to meet the third requirement of prudential
13
   standing, to wit, the requirement that a plaintiff's complaint fall within the zone of interest protected
14
   by the law invoked. PRASA argues that the present complaint does not fall within the CWA's zone
15
   of interest because said Act only authorizes citizen suits aimed at curtailing current discharges, and
16
   since the Palmer WWTP is not discharging, the complaint is not within the Act's zone of interest.
17
         PRCA, however, argues that prudential standing requirements do not apply to CWA citizen
18
   suits, citing in support the case of Public Interest Research Group v. Powell Duffryn Terminal.[12]
19
   "Congress may grant an express right of action to persons who otherwise would be barred by
20
   prudential standing rules." Gollust v. Mendell, 501 U.S. 115, 126 (1991)(citing Warth v. Seldin, 422
21

22  _____

23  *and the Irrelevance of Mootness Doctrine to Civil Penalties.* 11 Duke Environmental Law & Policy
    Forum 278, (2001).
24

25      [12] "In addition to constitutional considerations, there are prudential limitations that may lead
    a court to deny standing. In this case, we need not consider such prudential limitations since the Act
26  explicitly confers standing to the limits of the Constitution. See Warth v. Seldin, 422 U.S. 490, 501,
    45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975)...Section 505(a) of the Act allows a citizen to bring a civil
27  action against any person "who is alleged to be in violation of (A) an effluent standard or limitation
    under this chapter or (B) an order issued by the Administrator of a State with respect to such a
28  standard or limitation..." 33 U.S.C. §01365(a)(1). Section 505(g) further defines "citizen" as "a
    person having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g)." Research
    Group v. Powell Duffryn Terminal, 913 F. 2d 64, 70 n.3 (3d Cir. 1990).

1  CIVIL NO. 97-1493 (JAG/GAG)          13

2  U.S. 490, 501 (1975)). PRASA nonetheless contends that prudential standing requirements do apply

3  to CWA citizen suits, citing in support the cases of <u>Bennett v. Spear</u>, 520 U.S. 154, 163 (1997) and

4  <u>Dubois v. United States Dept. of Agriculture</u>, <u>supra</u>, 102 F. 3d at 1281. The <u>Bennett</u> case, however,

5  does not hold that prudential standing requirements apply to CWA citizen suits. The <u>Dubois</u> case,

6  in turn, did not entail a CWA citizen suit. It involved the Act with regards to the United States

7  Forest Service's approval of a expansion plan for ski resort without requiring an NPDES permit.

8    Prudential standing requirements need not be considered in cases brought under the CWA

9  because the Act explicitly confers standing. <u>Public Interest Research Group</u>, <u>supra</u>, 913 F. 2d at 70

10  n.3. It is evident that by entertaining this suit the Court would not be entertaining a dispute which

11  Congress did not intend it to adjudicate. <u>See</u> <u>United States Pub. Interest Group v. Heritage Salmon</u>

12  <u>Inc.</u>, 2001 WL 987441 * 7 n.3 (D.Me. 2001). PRASA's argument that PRCA's claim falls outside

13  the legislation's zone of interest because "[t]he Palmer plant does not discharge into navigable

14  waters and the Palmer Permit does not govern the conveyance of treated effluent from the Palmer

15  Plant to the Luquillo Plant," is inaccurate. (<u>See</u> Docket No.89, pg. 20). Although PRCA lacks

16  Article III standing as to the discharges made by the Brisas del Mar plant, it does possess standing

17  with regards to discharges made by Palmer plant. PRASA attempts to portray that the Palmer plant

18  does not discharge effluent into navigable waters. However, both parties have presented evidence

19  that said plant has occasionally discharged into the Mameyes River. Some discharges occurred after

20  the date on which the complaint was filled. More so, a genuine issue of material fact exists as to

21  whether the Palmer plant has discharged on other occasions and will do so in the future. Hence,

22  PRCA's claim seeking to enforce the Palmer plant's NPDES permit clearly falls withing the zone

23  of interest of the CWA.

24  **III. <u>Failure to State a Claim</u>**

25    PRASA alleges that PRCA fails to state a claim upon which relief may be granted. In

26  support of its allegation PRASA makes four arguments. First, that the Palmer plant is no longer

27  discharging. Second, that the plaintiff can not state a claim based on past violations. Third, that the

28  past diversions of treated effluent to the Brisas del Mar plant does not give rise to ongoing



1  CIVIL NO. 97-1493 (JAG/GAG)          14

2  violations.  Fourth, that the plaintiff's claims arising out of alleged violations of pretreatment

3  standards in connection with the Luquillo plant are not within the jurisdiction of the Clean Water

4  Act.

5          A.  <u>The Palmer Plant is No Longer Discharging</u>

6          PRASA states that "[e]ven the plaintiff does not dispute that the Palmer plant no longer

7  discharges into the Mameyes River.  Second Amend. Comp. ¶ 47."[13]  (<u>See</u> Docket No. 77, pg. 8).

8  However, PRASA's statement is not entirely accurate.  PRCA has alleged that the Palmer plant has

9  discharged into the Mameyes River on a number of occasions since August of 1996.  (<u>See</u> Docket

10  No. 83, Exhibit 1 and Docket No. 90, Exhibit 24).  PRASA provided the Court with an affidavit

11  from Engineer José R. Guzman, Regional Director of the Compañía de Aguas de Puerto Rico.  Mr.

12  Guzman stated, referring to the Palmer plant, "[t]hat said system does not have and will not have in

13  the future a discharge to the waters of Puerto Rico in violation of state and federal laws and

14  regulations."  (<u>See</u> Docket No. 77, Exhibit 14(B)).  PRASA also presents the Court with an

15  informative motion in which it states that the Palmer plant's outfall pipe was sealed off with cement.

16  (<u>See</u> Docket No.77, Exhibit 10).

17          PRCA admits that the plant's outfall was sealed off, however it questions "whether the

18  outfall seal constructed by PRASA is sufficient to prevent the occurrence of discharges from that

19  plant to the Mameyes River under all circumstances."  (<u>See</u> Docket No. 83, Plaintiff's 311.12

20  Statement, pg. 2, ¶¶ A(7) and B(3)).  In support of said argument, PRCA refers the Court to the "two

21  inadvertent and isolated overflows" which occurred at the pumping facility of the Palmer plant,

22  which the defendants allege were "isolated and unrelated to the operation of the Palmer plant." (<u>See</u>

23  Docket No. 77, pg. 3, n.4).  PRCA seeks information about the plant's mechanical operations, and

24  states that this matter represents a genuine issue of material fact as to whether the Palmer plant has

25  the capacity to discharge.  The Court agrees.  Of significance to PRCA's position is the fact that

26  _____

27          [13]  "Beginning on or about August of 1996, PRASA began to use the connecting pipe to
        discharge wastewater treated at the Palmer STP, through a point source located in the Brisas del Mar
28  STP, into the Sabana River.  Said diversion has continued since that date."  (<u>See</u> Docket No. 64, pg.
        11, ¶ 47).

1  CIVIL NO. 97-1493 (JAG/GAG)              15

2  "PRASA has not responded to [its] request for production of documents. [PRCA] served document

3  requests on PRASA on November 13, 1997." (See Docket No. 90, Exhibit 24). PRASA has not

4  challenged said allegation. PRCA states that it has not been provided with essential evidence

5  necessary to answer key questions regarding this issue. It thus requests the Court to permit further

6  discovery in order to establish whether the cement seal placed in the plant's outfall is sufficient to

7  avoid all discharges and to ascertain whether other overflow incidents have occurred at the plant.

8          Another genuine issue of material fact which the Court considers essential in deciding the

9  present issue is the following. The Court received evidence as to the plant's violation of its NPDES

10 permit with regards to the June 1998 incident (See Docket No. 90, exhibit 24). However, it has not

11 received information with regards to the November 1997 incident. The Court notes that PRASA

12 categorizes the incidents as two "overflows" which occurred at the pumping plant. Due to said

13 description and the limited information provided about the incidents, the Court questions whether



14 effluent reached the river by means other than the plant's outfall. Did the holding tanks overflow?

15 Was the pumping station overloaded causing a backwash of some sort? It is not impossible, from

16 the evidence of record, that such events may have occurred, thus forcing PRASA to use the outfall

17 in order relieve the plant, so as to avoid further discharges from sources besides the outfall.

18         PRASA has not met the burden of showing that it is entitled to summary judgment as to this

19 issue. In addition, the mere fact that the plant is not discharging does not mean that PRCA lacks all

20 relief.

21         B. Claim Based on Past Violations

22         PRASA next alleges that PRCA does not meet the jurisdictional requirement of Section

23 505(a) of the CWA, 33 U.S.C. 1365(a). PRASA argues that since the Palmer plant is not

24 discharging, any alleged violations brought forth by PRCA are "wholly past," and thus, irrelevant

25 for unconditional purposes. PRASA also alleges that PRCA cannot prevail because it failed to

26 demonstrate the likelihood of future violations.

27         Section 505, states that "any citizen may commence a civil action on his own behalf..against

28 any person..who is alleged to be in violation" of the Act. 33 U.S.C. § 1365(a). "The statute does

1    CIVIL NO. 97-1493 (JAG/GAG)          16

2    not require that a defendant 'be in violation' of the Act at the commencement of suit; rather, the

3    statute requires that a defendant be 'alleged to be in violation." Gwaltney of Smithfield, Ltd. v.

4    Chesapeake Bay Foundation, Inc., supra, 484 U.S. at 64. The statute entails the following with

5    regards to the alleged violations:

6         "use of the present tense in the definition of 'citizen' as 'a person'...having an
          interest which is or may be adversely affected' by the defendant's violations of the
7         Act. § 1365(g). This definition makes plain what the undeviating use of the present
          tense strongly suggests: the harm sought to be addressed by the citizen suit lies in the
8         present or the future, not the past."

9    *Id* at 59. Thus, as PRASA correctly states, "the interest of the citizen-suit is forward-looking...[and]

10   the harm sought to be addressed by the citizen-suit lies in the present or future, not in the past."

11   Surcco v. PRASA, 157 F. Supp. 2d 160, 164 (D.P.R. 2001).

12        The Court notes that PRCA must meet one of two requirements, to wit, (1) allege that the

13   violations to the Act are continuing, either on or after the date the complaint was filed, or (2)

14   convince the Court that said violations are likely to occur in the future. See Chesapeake Bay

15   Foundation v. Gwaltney of Smithfield, 890 F. 2d 690, 693 (4th Cir. 1989). See also Chesapeake

16   Bay Foundation v. Gwaltney of Smithfield, 844 F. 2d 170,171-172 (4 th Cir. 1988). PRCA has

17   complied with both requirements. PRCA has alleged that PRASA was in violation of the Act, on

18   and after, April 7, 1997, the date the complaint was filed. PRASA admits that the Palmer plant was

19   discharging into the Mameyes River until April 28, 1997. (See Docket No. 77, Exhibit 9, ¶ 4).

20   PRCA alleges that the plant exceeded the effluent limits of its NPDES permit twenty one (21) times

21   in April of 1997. (See Docket No. 83, Pg. 6 and Exhibit 1). PRCA has requested the Court to grant

22   further discovery to ascertain the precise dates of said violations. (See Docket No. 90, Exhibit 24).

23   Again, in June of 1998, the Palmer plant exceeded the effluent limits of its NPDES permit. The

24   plant's NPDES permit authorized it to discharge 0.25 MGD of effluent into the Mameyes River.

25   (See Docket No. 77, Exhibit 1, pg. 6). However, on June 10 and 26, 1998, the plant discharged

26   0.729 MGD of effluent into said River, violating both its flow limit and residual chlorine limit. (See

27   Docket No. 90, Exhibit 24). Therefore, considering the evidence of record, it is reasonable to infer

28

1  CIVIL NO. 97-1493 (JAG/GAG)          17

2  that the plant has incurred in post-complaint violations of the CWA.

3       PRCA also meets the second requirement.  In Part IV. of this Opinion the Court concluded

4  that a genuine issue of material fact remains as to whether the Palmer plant retains the ability to

5  discharge effluent directly into the aforementioned river.  PRASA has not met the burden of

6  persuading the Court that the past violations could not be expected to occur again.  At this stage,

7  recurrence of intermittent or sporadic violations at the Palmer plant in the future is not

8  animpossibility.

9       C. Past Diversions of Treated Effluent

10      PRASA alleges that the Palmer plant's diversion of effluent to the Brisas del Mar plant does

11  not constitute an ongoing violation to the CWA.  With said argument the defendant seeks judgment

12  determining that its acts of processing and conveying treated effluent between the Palmer and Brisas

13  del Mar plants do not constitute a violation of the CWA.  The judgment sought would resolve a

14  number of issues presented in claims one (1) through five (5) of the amended complaint, ¶¶ 64-115.

15  (See Docket Nos. 64, pgs. 14-23).  The Court, however, notes that PRASA limits itself to vaguely

16  citing definitions of general purpose and scope regarding the EPA's NPDES program.  PRASA

17  makes the following unsupported conclusions:

18      "The treated effluent conveyed from the Palmer plant to the Luquillo plant is not a
        discharge from the Palmer Plant.  No fair reading of the Clean Water Act would
19      permit this conclusion.  This statute requires, in order for there to be the requisite
        "discharge of a pollutant" an "addition of any pollutant to navigable waters from any
20      point source" must occur.  See 33 U.S.C. § 1362(12); 40 C.F.R. § 122.1(b)(1)... The
        scope of the NPDES permit requirements, including modification requirements, is
21      limited to the ""'discharges of 'pollutants' from any 'point source' into 'waters of the
        United States.'" 40 C.F.R. § 122.1(b)(1)."

22
23  PRASA's contention is that the effluent discharged through the connecting pipe to the Brisas del

24  Mar plant, and ultimately into the Sabana River, does not represent a discharge into navigable waters

25  for purposes of the CWA.  However, PRASA discharges though the connecting pipe to the Brisas

26  del Mar plant do not render the CWA inapplicable to the present case.  The fact that PRASA knows

27  that the Brisas del Mar plant discharged directly into the Sabana River is sufficient to satisfy the

28  requirement of discharging into navigable waters of the United States.  Therefore, all discharges

1    CIVIL NO. 97-1493 (JAG/GAG)            18

2    diverted from the Palmer plant to the Brisas del Mar plant are discharges from a point source into

3    navigable waters. <u>See</u> <u>Dague v. Burlington</u>, 935 F. 2d 1343, 1355 (2nd Cir. 1991)(citing <u>United</u>

4    <u>States v. Velsicol Chemical Corp.</u>, 438 F. Supp. 945, 947 (W.D. Tenn. 1976)).

5        PRASA's entire argument is based on the definition of "discharge of a pollutant," <u>see</u> 33

6    U.S.C. § 1362(12), and the following statement, "[t]he NPDES program requires permits for the

7    discharge of 'pollutants' from any 'point source' into 'waters of the United states'.." 40 C.F.R. §

8    122.1(b)(1). For purposes of summary judgment, however, the Court is free to ignore such

9    unsubstantiated allegations and conclusions. <u>See</u> <u>Súarez v. Pueblo International, Inc.</u>, 229 F. 3d 49,

10    53 (1st Cir. 2000).

11        D. <u>PRCA's Claim Regarding Pretreatment Standards</u>

12        The defendant makes two arguments as to PRCA's claim regarding pretreatment standards.

13    First, the plaintiff did not give the required notice of the pretreatment claim, thus the Court lacks

14    jurisdiction to entertain the issue. Second, that pretreatment regulations do not apply to the Palmer

15    plant.

16        In support of its first argument, PRASA cites 33 U.S.C. § 1365(c)(3). However, the

17    applicable section is 1365(b)(1)(A), which provides that no action may be commenced under section

18    1365(a)(1):

19        "prior to sixty days after the plaintiff has given notice of the alleged violations (i) to
         the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to
20        any alleged violator of the standard, limitations, or order."

21    The section merely states "that a would-be-plaintiff must give notice of the alleged violation to the

22    EPA, the State in which the alleged violation occurred, and the alleged violator." <u>Friends of the</u>

23    <u>Earth, Inc. v. Laidlaw Envtl. Servs.</u>, 528 U.S. at 174-175. PRASA argues that the "notice must

24    include a parameter-by-parameter description of the alleged violations, citing <u>Natural Resources</u>

25    <u>Defense Council, Inc. v. Texaco Refining & Marketing, Inc.</u>, 2 F. 3d 493, 499 (3d Cir. 1993)." (See

26    Docket 77, pg 15). The Court, however, notes that the case PRASA cites states:

27        "Nor is it particularly burdensome for plaintiff to make jurisdictional allegations on
         a by parameter basis, since federal regulations already require plaintiffs to provide
28        a notice of intent to file suit containing "sufficient information to permit the recipient



1  CIVIL NO. 97-1493 (JAG/GAG)        19

2      to identify the specific standard, limitation, or order alleged to have been violated,
       the activity alleged to constitute a violation...[and] the date or dates of such
3      violation." 40 C.F.R. § 135.3; see U.S.C. 1365(c)(3). In addition, citizen-plaintiffs
       should have ready access to the relevant information, which is contained in publicly
4      available DMRs. See 40 C.F.R. §§ 2.101; 122.7; 122.41(j), (l); 122.44(i); See also
       33 U.S.C. § 1314(i)."

5

6  Id. at 501. This case cites 40 C.F.R. § 135.3, which provides the requirements that should be met

7  when filing a notice of intent to sue. The Court has carefully evaluated PRCA's notices and

8  concludes that these contain sufficient information to properly inform the pertinent parties of the

9  impending action as well as the claims to be raised, thus meeting the requirements set forth in

10 section 1365(b)(1)(A). See Docket 77, Exhibits 12, pg. 3 and 13, pg. 3). Also,

11      "'[Section] 1365(b) only addresses the commencement of an action without notice.
        It does not ban plaintiffs from introducing new legal arguments in continuing
12      litigation based on changes underlying circumstances.'"

13 García v. Cecos Int'l, 761 F. 2d 76, 80 (1st Cir. 1985)(citing Kitlutsisti v. Arco Alaska, Inc., 592 F.

14 Supp. 832, 842 (D. Alaska 1984)). Five years have passed since PRCA issued the notices. During

15 that time the circumstances of the case have evolved significantly, thus requiring PRCA to modify

16 its claims. Additionally, the Court notes that the notice of intent to sue, provided by a plaintiff, may

17 vary according to its "access to the relevant information." The Court has considered the extent of

18 information that PRCA may have had access to prior to filling suit and concludes that PRCA's

19 notice fulfills the notification requirement. Thus, the plaintiff has statutory standing.

20      Second, PRASA contends that pretreatment standards do not apply to the Palmer plant

21 because it not a "user," thus not subject to pretreatment standards. In support of its argument

22 PRASA limits itself to citing the Code of Federal Regulations' definitions of general purpose as to

23 pretreatment regulations, as well as an affidavit from Martha Rivera Rosa, Pretreatment Program

24 Director for PRASA. (See Docket 77, Exhibit 17). The affidavit states that the Palmer plant "is not

25 subject to pretreatment requirements or a National Pretreatment Standard" and that the Palmer plant

26 does not "receive waste from any significant industrial users." (See Docket No. 77, Exhibit 17).

27 PRASA, however, has failed to properly explain how this statement supports its legal argument that

28 the effluent which the Palmer plant conveys to the Brisas del Mar plant is not subject to pretreatment

1  CIVIL NO. 97-1493 (JAG/GAG)            20

2  standards.  In support of its argument PRASA reaches its own conclusions without citing case law

3  or any other authority.

4  **IV. The Plaintiff's Claim is Moot**

5         PRASA alleges that PRCA's claim is moot.  It states that the Palmer plant's outfall was

6  sealed off with concrete, and that most of the expansion has been dismantled, thus, rendering the

7  plant no longer able to discharge into the Mameyes River.  PRASA asserts that since the plant no

8  longer discharges, the case is moot.  Quoting <u>Friends of the Earth</u>, <u>supra</u>, PRASA contends that:

9         "The doctrine of mootness can be described as 'the doctrine of standing set in a time
          frame: The requisite personal interest that must exist at the commencement of the
10        litigation (standing) and must continue throughout its existence (mootness).'
          <u>Laidlaw</u>, 528 U.S. at 189." (<u>See</u> Dockets 77, pg. 29 and 89, pg. 21).
11

12 However, "[c]areful reflection on the long-recognized exceptions to mootness, however, reveals that

13 the description of mootness as 'standing set in a time frame' is not comprehensive."  <u>See</u> <u>Friends</u>



14 <u>of the Earth, Inc. v. Laidlaw Envtl. Servs.</u>, <u>supra</u>, 528 U.S. at 189-190.  Standing is assessed as to

15 the time the action commences, whereas mootness concerns whether a judicial controversy existed,

16 but at present no longer remains.  <u>See</u>  <u>Becker v. FEC</u>, 230 F. 3d 381, 389 (1st Cir. 2000).

17 "Furthermore, if mootness were simply 'standing set in a time frame,' the exception to mootness that

18 arises when the defendant's allegedly unlawful activity is 'capable of repetition, yet evading review'

19 could not exist."  <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.</u>, 528 U.S. at 190.

20        On April 7, 1997, the date the suit was filed, the Palmer plant was discharging directly into

21 the Mameyes River through its outfall.  Since August of 1996, the plant had not discharged into said

22 river.  However, in March of 1997, April of 1997, November of 1997 and June of 1998, discharges

23 were reported.  Those discharges allegedly involved violations of the plant's NPDES permit.  The

24 plant's outfall was subsequently voluntarily sealed off, by PRASA, at some time in late 1998.

25 PRASA alleges that the cement seal renders discharges into the Mameyes River impossible, thus

26 preventing the plant from incurring in violations to it's NPDES permit.  The Court, however, must

27 ascertain whether said violations are capable of repetition.

28        Regarding the issue of  redressability, the Court notes that PRCA seeks a declaratory

1  CIVIL NO. 97-1493 (JAG/GAG)              21

2  judgment, injunctive relief, civil penalties, and the award of costs and attorney's fees. PRASA

3  contends that such requests are moot. The only possible basis for a finding of mootness in this case

4  is if PRASA voluntarily complied with the Palmer plant's NPDES permit, and sealed off the Palmer

5  plant in a manner in which absolutely impairs, under all circumstances, discharging into the

6  Mameyes River.

7          The "doctrine protects defendants from the maintenance of suit[s] under the Clean
        Water Act based solely on violations wholly unconnected to any present or future
8        wrongdoing, while it also protects plaintiffs from defendants who seek to evade
        sanction by predictable 'protestations of repentance and reform.'"
9
   See Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 66-67 (1987). Thus,
10
   PRASA must meet the heavy burden of demonstrating that there is no reasonable expectation that
11
   the wrongs committed will be repeated. See Id. If PRASA succeeds in meeting the burden prior
12
   to judgment the remedies sought may be moot.
13
          In the present case PRASA voluntarily sealed the plant's outfall, and alleges that there exists
14
   no possibility of future discharge into the Mameyes River ("[a] cement seal over the outfall prevents
15
   any discharges from the Palmer Plant from reaching the Mameyes River and the Court can be
16
   absolutely certain no discharges will occur." (See Docket 89, pg 23.)).
17
          "'It is well settled that 'a defendants voluntary cessation of a challenged practice
18        does not deprive a federal court of its power to determine the legality of the practice.'
        City of Mesquite, 455 U.S. at 289. 'If it did, the courts would be compelled to leave
19        the defendant ...free to return to his old ways.' 455 U.S. at 289, n. 10 (citing United
        States v. W.T. Grant Co., 345 U.S. 629, 632, 97 L. Ed. 1303, 73 S. Ct. 894 (1953)).
20        In accordance with this principle, the standard we have announced for determining
        whether a case has been mooted by the defendant's voluntary conduct is stringent:
21        'A case might become moot if subsequent events made it absolutely clear that the
        allegedly wrongful behavior could not reasonably be expected to recur.' United
22        States v. Concentrated Phosphate Export Assn., Inc. 393 U.S. 199, 203, 21 L. Ed. 2d
        344, 89 S. Ct. 361 (1968.) The 'heavy burden of persuading' the court that the
23        challenged conduct cannot reasonably be expected to start up again lies with the
        party asserting mootness. Ibid."
24
   Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. at 189. PRASA has proffered evidence
25
   as to the plant's sealed outfall, however, said evidence is not sufficient to meet the burden of
26
   convincing the Court, at this stage, that discharges into the Mameyes River are not possible. (See
27
   Docket No. 77, Exhibit 10).
28

1  CIVIL NO. 97-1493 (JAG/GAG)              22

2         The Court has considered a number of factors and notes that this case is fundamentally

3  different from the <u>Friends of the Earth</u> case. First, the Palmer plant not only retains its capacity to

4  process waste water; it is presently doing so, although not discharging into the Mameyes River.

5  Instead, it is diverting its processed effluent through a pipeline to the Brisas del Mar plant. Second,

6  the Palmer plant has not relinquished it's NPDES permit and is currently authorized to discharge

7  into the Mameyes River. Third, the plant is equipped to process 0.75 MGD of waste water, while

8  its NPDES permit only authorizes the discharge of 0.25 MGD. Fourth, in November of 1997 and

9  in June of 1998, overflows occurred at the Palmer plant's pumping facility, while conveying effluent

10 into the Mameyes River. It is apparent to the Court that the Palmer plant is fully operational and it

11 seems that it retains the ability to discharge effluent directly into the aforementioned river by merely

12 removing the outfall's seal.

13        Upon careful consideration, the Court concludes that this case is not moot. PRASA has not

14 met the burden of persuading the Court that the past violations could not be expected to recur.

15 **V. Continuance of Discovery**

16        The plaintiff requests the Court to allow further discovery under Rule 56(f) of the Federal

17 Rules of Civil Procedure, if it were inclined to grant the defendants motion for summary judgement.

18 PRASA states,

19        "[t]his discovery seeks information concerning the compliance history of both the
         Palmer and Brisas del Mar WWTPs, including their permits, discharge monitoring
20       reports, remedial measures, and the operation of the plants and the connecting
         pipeline between them. PRASA has never responded to this discovery." (See
21       Docket 83, pg. 29).

22 The discovery sought entails information about both plants including details regarding the alleged

23 violations to their NPDES permits. The Court notes that further discovery would be in order under

24 Rule 56(f) were the Court to grant summary judgment as to the Palmer and/or Brisas del Mar plants'

25 compliance record, remedial measures or overall operations. However, the Court grants partial

26 summary judgment on other grounds. Partial summary judgment is granted regarding the issue of

27 plaintiff's lack of Article III standing to file a CWA citizens suit intending to enforce the Brisas del

28 Mar plant's NPDES permit. The grounds upon which the Court granted summary judgment are

1    CIVIL NO.  97-1493 (JAG/GAG)              23

2    distinct to those on which the plaintiff bases its request for further discovery.

3            A "party must 'set forth a plausible basis for believing that specified facts,
         susceptible of collection within a reasonable time frame, probably exist' and
4        'indicate how the emergent facts, if adduced, will influence the outcome of the
         pending summary judgment motion."

5
     C.B. Trucking v. Waste Mgmt., 137 F. 3d 41, 44 (1 st Cir. 1998).  The Court notes that neither in
6
     it's memorandum of law, nor in Attorney Ginés Sánchez' declaration, does the plaintiff request
7
     further discovery with regards to PRCA's Article III standing.  (See Docket No. 83, pg. 29-30 and
8
     Docket 90, Exhibit 28).  Thus, the Court denies the PRASA's request and proceeds to adjudicate the
9
     Motion for Summary Judgment with regards to the issue of Article III standing.
10
     **VI.  Conclusion**
11
            PRASA's motion for summary judgment (Docket No. 77) is **GRANTED** in part and
12
     **DENIED** in part.  Summary Judgment is hereby **GRANTED** as to PRASA's argument that PRCA
13
     lacks Article III standing to enforce the Brisas del Mar plant's NPDES permit, under Section 505(a)
14
     of the CWA.  Summary Judgment is hereby **DENIED** as to PRASA's arguments regarding to
15
     PRCA's lack of Article III standing to enforce the Palmer plant's NPDES permit, PRCA's lack of
16
     prudential standing, PRCA's failure to state a claim upon which relief may be granted and mootness.
17
     **SO ORDERED**
18
     In San Juan, Puerto Rico, this 23rd day of August, 2002.
19

20

21                                                          U. S. M. J.

22
                                                      GUSTAVO A. GELPI
23                                                    United States Magistrate-Judge

24

25

26

27

28